We'll begin on May 24, 2008. Mrs. Kintaro v. Bank of America. I see the council is present at the council table which is ready to begin. I will thank you if you will not move the calendar. We are ready to start. Thank you. Thank you and may it please the court, Lisa Blatt for Bank of America. For three reasons, New York's ban on interest-free escrow accounts is preempted. First, Congress intended national banks to have flexibility on how to price mortgages. Second, New York's law unduly burdens national banks and risks destroying their uniform character. And third, no factual showing is required to find preemption. So can I ask you to lay out in as precise terms as you can, and I'm asking a question which may seem very basic because I have further questions and I don't want us to be fighting over terminology, so take it in good faith. How would you articulate precisely what the Supreme Court said we did wrong? Like what do we need to avoid? So what the Supreme Court, and it wasn't just you because it was what our brief advocated well, is the control test. And so what the Supreme Court said is that it read this decision and our brief is saying any law that purported to control a national banking power and it left and I think it's footnote 10 of your opinion said that left to states. Well, my understanding of the oral argument was that your friends on the other side said that it wasn't a matter of degree. And that was the position that what we're talking about is not a matter of degree. And if we understand our prior opinion as focusing more on what was the nature of the invasion versus the significance of the effects, I'm just struggling. I would like for your help in articulating what is the practical difference between both of those. Yeah, so we obviously were at the oral argument. So what the difference is is what I was trying to say about generally applicable law. What the court found objectionable at the control test is it only left to state regulations, generally applicable law like tort law and contract law. And your opinion says in a footnote don't worry about the control test because this will leave generally applicable law. Now, our test and I think what the Supreme Court said is we don't want to hear the control test. We want this nuanced comparative analysis. We want your opinion grounded in the case law. And there needs to be some regulation that regulates banks qua banks. And we think. Okay, but they also in the end I think it wasn't banks per se. It was statutes. It wasn't class. We didn't have to do a bank-by-bank analysis. We had to do a statute-by-statute analysis. Yes. So what I meant by banking is fair lending laws are laws directed at banks. Laws that prevent banks from engaging in fraud are directed at banks. And then the law in Anderson was directed at banks because it was a law that dealt with abandoned accounts with a sheet to the state. And so those are all laws that are directed at banks. But we also read the Supreme Court is 9-0 rejecting the other side's test, which would look at a factual showing and be done bank-by-bank, maybe for this day only when market conditions change, and that you would look to burden or cost of compliance. We read the Supreme Court is taking that off the table. You started with, I think, flexibility in pricing mortgages and suggested, I think that's what you said, and suggested that New York's law is a significant interference with that bank function. Could you elaborate on that? Yeah. So our argument proceeds in a couple steps. The way we see it, and the first reason is this congressional indicia of flexibility, and we rely on two aspects. First is that Congress has comprehensively regulated the consumer protection measures necessary for escrow accounts and has not required interest. And second is that Congress speaks expressly when it contemplates state interest rate laws. Can you tell me what you think the best evidence is for why that deferential treatment was intentional? Sorry, which treatment was intentional? The idea of listing some as having escrow and then others not. What is the evidence, let's say, that indicated that Congress expected us to imagine them being different? I'm not sure I understand the question. So in terms of just putting this with the case law of Franklin infidelity, which I think are the two leading cases for preemption, and then there's the San Jose, which is burden. In terms of the court in Franklin said that Congress used the word savings and therefore that was expressed. And in our case, we have the same amount of expressed words being used because Congress has specifically spoken to the conditions when states can impose interest rate laws. And it specifically has... Well, I mean, and that's my point, is you're saying that Congress has expressly spoken in some instances as to interest rate laws, and you're asking us to have some sort of negative inference that it meant to do something different by not expressing it. But what's your best evidence suggesting that that choice was intentional and that that differentiation and treatment would interfere with the scheme that Congress carefully prompted? Sure, a couple points. In Franklin footnote 7, the Supreme Court cited Section 12 U.S.C. 85, which is the very statute we're relying on, as showing that Congress knows how to allow local regulation and interference when it wants to. And Section 85 is the statute that allows states to impose interest rate ceilings but not floors. Now, this is to us highly significant because we think it would be sort of obvious that states could not pass minimum interest rates law on savings accounts, checking accounts, and CD deposits. That would be just extraordinary, and there's no basis for distinguishing that kind of depository accounts from an interest escrow account. It's just money in the bank. Unlike in Franklin, where a bank can actually have a savings account without advertising, banks cannot have mortgages without pricing them, and pricing sort of the interest rate is so integral and fundamental to the express mortgage power that it's hard to think of any other feature of a mortgage other than maybe the length of the loan, the down payment, and the size of the mortgage. I'm sorry, go ahead. But what aspect of the pricing is making this such a significant burden? Is it the fact that the price might vary from within a state or from state to state? I mean, 2% does not sound like a, if you know that that's the rate, it doesn't sound like it would affect pricing that much. So I'm trying to understand the question of why this is. Yeah, a couple of responses. We think that preemption is not based on a practical showing of burden any more than it would be a state law that told you what the minimum page requirements of your opinions would be. You don't need a trial to know that that is a significant interference with your judicial power, even though it would be very easy for you to fill up pages with an opinion simply by reciting the arguments the party made. It is a, by its nature and by its degree, it interferes with a express mortgage power. Again, I think it is hard to imagine a greater intrusion in terms of severity and extent than controlling the price of a mortgage product. Now, your second point about the state law in particular, we do have a completely independent argument that's based on this sort of undue burden of having a patchwork of 50 state laws, because if you had 50 different state interest rates, it would be, they're all tied to different rates, they're all tied to different indices, and they all cover different property. New York in particular is highly harsh because it can, there's no cap, it can change on one week's notice, and it can change every three months. And so we are relying on that kind of practical burden as well. And if you say that this law is not preempted, it does pave the way for a state to regulate all aspects of a mortgage, like the down payment, and actually the state could ban escrows altogether unless reasonably necessary. So it sounds like you're saying that for interest on escrow laws, they sound categorically preempted by their nature, if it's going to affect pricing in this way, that doesn't require us to really assess degree. You could assess degree in some ways. No, we do. Yeah, we do degree, because we define degree as extent and seriousness, like a degree of doubt, a degree of skill, and an interest rate as a way more invasive intrusion than an advertising in Franklin, because it goes to the court. I think there's some force to that, but I'm just concerned that part of what I think the Supreme Court was suggesting was that our language in the opinion where we're talking about the nature of the invasion versus the significance of the effects is what they grabbed onto to say we weren't looking at significantly interfere, and it sounds to me that you are just repackaging that nature of the invasion argument, which I think the Supreme Court intended to reject by saying, no, you need to be looking at the significance of the effects. Is that wrong? Yes, because we are looking at the very nature of in terms of what kind of protections when the state and all of these states pass the escrow laws to protect, interest rate laws to protect consumers. Congress took a different reaction in RESPA and it three times has rejected interest on escrow accounts. Moreover, in terms of the court's opinion, the court said you look at the text and structure of the laws, common sense, and precedent. Nowhere on there, nowhere did the court say a trial record as to the nature of degree. No case since 18- Well, there was no question about the trial record, but a lot of the discussion on this, and you know when you were there, I just had to listen to it. Sorry. A lot of the discussion of the Supreme Court seemed to be over how one should know whether or not significantly interfered and whether or not there was, whether or not there needed to be a trial, whether it was a question of law, and I think both parties had some answers, including some of the justices, that people need to not overly belabor what is in front of them, and then that also brought into the question of what the OCC was supposed to be finding. So there seemed to be a lot of discussion, but not a firm articulation from the Supreme Court about what this is, and so how can we interpret that the Supreme Court thought that complying with their opinion meant having many trials? So I think it's fair to say that when you have a 9-0 opinion, there wasn't going to be a lot decided, especially when you saw how divided the argument is. But I think it becomes very clear from that opinion when the court says you have to look at these cases, and as I was saying, there's not a single case in 160 years of banking preemption that has ever required any kind of factual showing. Franklin is the leading case. Franklin, the court said that banks must be deemed to have the right to advertise the way they want to with no factual analysis, despite the Court of Appeals of New York saying that the weight of the evidence shows no substantial interference. That had no impact on the Supreme Court. There is simply no case in any setting in the Supreme Court or any case post-Contero and the district courts that have had to grapple with this that has ever required a factual showing. And I go back to my minimum page number. You would not have judges testifying or any kind of cost concern, whether it was four pages, two pages, eight pages, or ten pages. If a law was passed, the nature of it would be offensive, and the degree of it is also offensive because it goes to the core of what you do. And in terms of an express mortgage power, there's nothing more fundamental than its price on the interest rate. And if the other side, I think, is going to have to eat, that they would allow states to impose 50 different interest rate requirements on every form of CD that a bank offers. Can I go back to the flexibility test? How does that differ from the control test? I'm just having a hard time with it. That's a fair question. So I don't want to be quoted, and please don't write an opinion saying we have a flexibility test because I don't think that will fly. I think we're saying that you need to find some indicia of Congress's flexibility with respect to the law at issue and the power at issue. It can't just be, well, this interferes with banks' flexibility to do yada, yada, yada. And that's why we are trying to rely very specifically on the two aspects. That is, Congress has talked about and regulated extensively on the escrow accounts. Everything is regulated about the escrow, but the one thing Congress did not say was necessary was interest. And Congress on the usury laws has said when states can do it. And also there is the 1639D, which was the focus of the last argument, where Congress has saved state interest on escrow laws that would be otherwise applicable. So Congress knows how to allow this. And I think I said, yeah, I'm pretty sure I said that Franklin relied on the fact that there were these other statutes. So I wouldn't say that every law that impinges on the flexibility is going to be preempted, but I think this is a much easier case because it goes to the interest rate or pricing scheme. And I'm not going to rule out that other laws we'd have a harder time making a preemption showing. You started, your second point was about the uniform character of the national banks. Did you want to elaborate on that? Yeah. Sure. And then if I could get back to one other point about the case law because I do think what has to be done is a comparison to Franklin and Fidelity and then to San Jose. And let me just go back with the San Jose. I think what we find very convincing is the notion of the dual banking system. And the one thing about Bank of America is you should have a mortgage that looks the same in New York as it does in Florida. And if they're right and states can pass laws with every little jit and toddle of the mortgage on the pieces I talked about, the mortgage is going to look no different in the Manhattan branches, the Yonkers Bank and the Flushing Bank. And the mortgages and the CD accounts are going to look like the Bank of Miami. And so in that uniform kind of character, you're supposed to have different banking products. If I could just go back to the case law because they sort of say that all these cases are different. And when they try to say that, well, Franklin, Congress used the word savings. And I just think as I said, Congress used the word interest rates and it used the word escrow. The other thing they rely on is the fact that there was a regulation in Fidelity that allowed banks to, I think it was thrifts, to have these due on sale clauses. And they say there's no regulation authorizing interest-free escrow accounts. And I would just like to point out that the 2004 OCC preemption regulation presupposes the obvious fact that banks can offer interest-free escrow accounts because regulations can't purport to preempt a non-existent power. The other thing if they try to rely on that regulation is they can't square their reliance on a regulation in Fidelity with their position in their 28J letter that said, this is on February 24th, that said if OCC today were to pass a regulation saying, sure, banks can offer interest-free accounts, no big deal, they said that would not be preemptive. So in their view, a regulation on point is both necessary to come within Franklin and it's irrelevant if it happened today. So there's something wrong with that interpretation. The other thing that they have said over and over, and this did come up in oral argument, is did Franklin and Fidelity involve a ban? One was a ban on advertising in Franklin, and then in Fidelity it was the ban on due-on-sale clauses unless reasonably necessary. And we've articulated this as a ban, too. It's a ban on interest-free escrow accounts. Now, it's semantic because you could say what California did was it allowed due-on-sale clauses, it just said they had to reasonably necessary, and New York allowed advertising. But here's where the rubber meets the road on their position. If their position is that this doesn't count as a ban, then any state could avoid and circumvent Franklin and Fidelity by rewriting their law to be an allowance. So California could say you can have due-on-sale clauses as long as you're reasonably necessary, and New York could pass a law saying you can advertise, you just can't use the word savings, and we think it shouldn't make a difference that New York law says if you are going to have escrow accounts, you must pay 2% interest. That's not in form, but it's in substance the same as saying you can't have an escrow account unless you pay interest. And in California, bank officials go to jail. In New York, it's $25,000 fine or penalty, so there are very severe penalties if you violate this. And there are about 13, I think this was in the SG's brief, 13 states that have interest on escrow accounts now. So I thought it was 13, but then I think someone said the briefs mentioned 12. I see 12, 13, and 11. So that's why I think I got confused. I'm going to say it's around a dozen. I counted 13, but someone said in the briefs it has a different number. And I know I think maybe at one point there were 13, but two of them repealed their laws, and so maybe that's why it turned into 11. I'm not sure. The other thing I want to get back, which you had mentioned, on what's so pernicious about this interest rate law, and that is this issue of they've said you have to show that it would deter escrow accounts or be a burden, but they've never said how much deterrence, how much burden. Is this bank by bank, and is it good for one day only? Isn't that what we're supposed to be deciding, what is a significant interference, like the how much is too much? No, because if you had that approach with every single national bank having to go into court, showing that the burden was on them particularly, and the minute market forces changed, i.e. if interest rates changed, the preemption holding would be no good. You'd have to run back into court. Take the Hein mortgage. When it was issued in 2016, it was 33 percent. The 2 percent was 33 percent, 33 times higher than the national savings average. Today, 2 percent, New York's 2 percent, while sounding modest, is almost 5 percent, the national savings. It's still exceedingly high, and in your hypothesis, if a bank could show it, and again, they could not tell you, and I don't know if they're going to tell you how a bank would do that. I don't know what it means to say, well, we'd be deterred from offering escrow accounts. Federal law requires escrow accounts for a lot of federally insured loans, like for FHA, and I think it's the Department of Agriculture. So the bank has to provide those. So they would just say, well, you know, it costs us a lot of money, and one bank would say our computer system can easily do this, but another one would say, well, 49 was fine, but the minute it went to 50, it got really hard, and then another bank says, well, you know, our technology has changed, and I just don't know how preemption would ever be, it would just last for that day, and I think this is what the court talked about, about the death by 1,000 cuts. I'm wondering if you could comment just on the San Jose and the Kentucky case, because I kept trying to do this nuanced comparative analysis, going back and forth between those two cases, because they went the opposite direction, and yet they seemed to involve something that you could say is very similar laws in the two jurisdictions. I think that's correct. I think what the court, and then, of course, Anderson tries to, you know, recharacterize San Jose, and then Quintero does it one more, and then characterizes those two. So you've got to sort of deal with these. But the way I read both San Jose and Anderson is exactly the way the panel did, and I think the quote from that is that the reason why the Kentucky law was not problematic is it literally just changed the name of the account holder, and there was this implied power to, you know, take people's deposits and loan money, but the court said, and Quintero repeated it, that that law had no infringement or encroachment on any authorized power of the bank, because it was as old as the common law itself. You just had to pay whoever was asking for the money. In the California case, San Jose, it sounded very similar, but I think the court in Quintero said the difference is that there was no proof of abandonment, so the state just kind of came in and seized it, and there's definitely aspects in their opinion that's repeated in Quintero that this might deter customers, and so that's in there, and the other side is going to rely on that. We focus on the other language of that opinion that talks about how this would, you know, burden the uniform character because if California were to do this for 20 years, another state could do it in seven years, another state could do it in two years, and so we're relying on that kind of aspect to be sure this undue burden, it got picked up in waters, and so it's repeated in waters, but we haven't cited waters because the Supreme Court in Quintero didn't, but that's where we are, so it's like it's not like this undue burden came out of nowhere. The court in waters mentioned it too, but we've tried to stick to just the case law that the court in Quintero relied on. I think that's it. If you've got no more questions. Okay, thank you. Good afternoon, Your Honors, and may it please the court, it's good to be back before you. The Supreme Court in this case unanimously rejected Bank of America's argument that New York's generally applicable interest on escrow law may be declared preempted under the prevents or significantly interferes with standard without any examination of the law's effects on national banking powers. Instead, the Supreme Court held, and I think this is an answer to your question, Judge Perez, that the significant interference standard requires courts to, quote, make a practical assessment of the nature and degree of interference caused by the state law and then determine whether that's significant. Right, but I think part of the thing that I'm struggling with, and you saw me talk to your colleague about it, is that, I mean, we quoted the correct standard a bunch of times. I think certainly one interpretation of our opinion was that we were trying to provide a definition for what significant interference meant. And the one that I see being the clearest in our opinion is contrasting the nature of the invasion versus the significance of the effects. And I thought that that might be something we could work from until I kept hearing, actually, in your oral argument for the Supreme Court, that you were talking about it in terms of the banks' exercise of a particular power at issue, which to me sounds like control. So can you help me articulate precisely how you think we are supposed to define what a significant interference is that is not what we did beforehand that was presumably rejected? So I can give you a couple of guideposts, and I'll just say, before answering your question directly, I think the most simple way of resolving this case is just to acknowledge, Judge Park, as you just pointed out in your colloquy with my friend, that Bank of America's test, their proposed replacement for the control test, it uses different verbal formulation, but it ends up in the exact same place. It preempts exactly the same set of laws, it just has a different label. And I think if there's one thing we know from the Supreme Court opinion, it leads a lot for lower courts on remand and other cases to figure out, but if there's one thing that's absolutely clear, it's that the control test and a test that amounts to the exact same thing cannot be the law. And so you asked about what sort of, if you want to say more than that. We need a definition of significant interference, and I thought the one you were trying to put forward before the Supreme Court, which they did not put in the opinion, was something about national banks being able to exercise a particular power that significantly interfered with the national banks' exercise of a particular power. That doesn't seem to be what the Supreme Court decided. So I'm looking for a viable definition of what significant interference is. So I'll do my best to answer that question. So we know a couple of things from the opinion. You need to make a practical assessment of the nature and the degree, and I think both are important here. My friend was discussing that with you all. And then it's got to be in relation to the particular power, and I think the power has to come ultimately from Congress. I think if it's a preemption question, that's the way that you should conceptualize it. But at a minimum, it would have to come from an agency that defines the power in a particular way. If we're looking at the congressional power, if we're looking at the banking power, then how does that square with the practical effects? Because on one hand, one looks like a categorical approach, that we're looking at certain classes of things. And then the other one is what it's doing in the world. Where are we at? Which one do we need? So the practical assessment, I think, is just looking at how it operates in practice, which is looking at real-world effects. I'm sorry, so is that real-world effects on the power or real-world effects on the market, the product, banks? I think it's on the exercise of the power, but I think you would look at both. Because, like, right now they're coming in and saying, you know, every time it changes, every time the market rate changes, like, they'll be just all of these things. So you're saying it's the practical effect on the power that is being exercised, not the ripple effect it has on the market or what consumers expect. I think that's right. And the asserted power, the only thing we've got from Congress is the power to make real estate loans. And this is a kind of second-order incidental power where we're talking about mortgage escrow accounts where Congress hasn't said anything specific about national banks having the power. I think it's a fair implication from everything that Congress has done. The national banks, in fact, have that power. But Congress hasn't said anything specific about mortgage escrow, excuse me, about providing interest on those accounts, except in the TLM, where it seemed to embrace state laws, at least with respect to covered accounts. And I think, just to go back to try to answer your question, I think what's important here is you would look at both the nature and the degree. And I think Franklin National Bank is helpful in this respect. Actually, on both prongs it's helpful. So the nature question is a question of, is it qualitatively significant? And the degree question is, is it quantitatively significant? And in Franklin, in the state court, and this was particularly clear in the trial court, but it was also clear in the New York Court of Appeals, there was a trial about the significance of the New York law issue, which prohibited national banks from being able to use the very word that Congress itself used, which is the word savings accounts. And there was a testimony. There were financial statements. There were consumer surveys. There was an attempt to endeavor the way in which this law worked some real effect on the ability of national banks to actually exercise the specific power that Congress had. But the Supreme Court didn't reference that testimony. And I think the reason why, to answer your question, is it found that there was actually an easier way to resolve it, which is by focusing on the nature of the interference. And the nature of the interference there was significant because Congress had itself used the word savings in the statute. And so it was a kind of textual analysis that the court was able to adopt and bypass the question of degree of interference and just focus on the fact that Congress itself had used that label. And in that sense, it's really kind of of a piece with other cases like Barnett Bank that are able to resolve the question as a matter of statutory interpretation. Let's say here, then, if the nature of what's being regulated is a banking power, then you would say we go to the impact, the more quantitative part of it, which requires discovery and analysis. I think that's right. And the way I would think about how to approach the question here, you have a nondiscriminatory law that state banks, and in fact, even non-banks, like Rocket Mortgage, for example, have been complying with for decades. And there's no statute on the subject that would be relevant as to what the banking power would be. There's not even a rule. I mean, isn't it possible then at that point that, say, Bank of America gets a discovery, no significant impact, but Rocket Mortgage maybe is in a Ninth Circuit case involving a similar law, and there it is a significant impact. So I think I'll take the hypothetical as if it's a national bank that also would be. Just to make it a little more difficult on myself. I think that if what you're hypothesizing, and this was discussed at the oral argument in the Supreme Court, is the possibility that there could be different national banks in different cases making different factual showings, and that could lead to different results in different cases, and that would create some kind of disharmony in the law or confusion, I think you could expect either the Supreme Court at some point to step in and to resolve that question, or I think the OCC would probably be pretty quick to come out with some kind of rulemaking of its own to bring its expertise together. Is there any other area where preemption operates like that, where it can depend on the entity being regulated and the economic circumstances? No, I think the ultimate question is not whether it imposes a significant interference on the particular bank in the case. The question is whether it imposes a significant exercise on the exercise of the national banking power, which is at issue, and that's the same question as across different cases. It just might be answered on a different record in different cases, and I think eventually— So the discovery that you would want here on a remand has nothing to do with Bank of America, it has to do with national banks? Well, we don't want—I mean, it's their affirmative defense, and they're the ones who get to come forward and say, even though this is a nondiscriminatory state law, even though we don't have any statute that says we have this power and there's no prevents argument, and even though we're only talking about downstream effects, we think that this operates as a significant impairment on our ability to offer this product. And I think it would be incumbent on— Again, my question is, is this a Bank of America question or a national bank industry question, then? I think national bank is a kind of quintessential national bank— excuse me, rather. Bank of America is a kind of quintessential national bank, and I think it could use its own experience as evidence that would bear on the question, but ultimately it's a question for the entire industry of national banks. And I do think at some point the OCC would be pretty quick with a rule. Now, it's been 15 years since Congress enacted Dodd-Frank. The OCC to this day, to my knowledge, has not done the kind of work that's required of it. And so I think to the extent that there's some concern about what's going to happen, it's really in part up to the OCC to come up with a rule if it thinks that a particular law, even if it's nondiscriminatory, even if there's not a statute that would give rise to a prevention argument, that once you look under the hood, the effects are significant enough that it causes a problem and that it can come forward and bring its significant expertise to bear, bring its data collection to bear, and use that to educate courts in making the ultimate legal question, which is a question for the court of whether there's significant interference. So the Supreme Court says that your position would yank the preemption standard to the OCC industry and preempt virtually no nondiscriminatory state laws. So what room is there in your view for the argument that you're presenting now that hasn't been foreclosed? So, well, I think the Supreme Court said that to the extent that we're making an argument that virtually no laws that are nondiscriminatory would be preempted, I don't think we're making that argument here. I mean, other than excluding, you know, Franklin Fidelity and San Jose. No, I mean, we've got Barnett Bank, we've got Franklin, we've got San Jose, and I think the cases I would look to, if you're looking to the degree of interference cases, I count four of them from the Supreme Court in the quantitative significance. One is Anderson, and another is San Jose, and the pair of cases is kind of hard to discern, and it would be helpful if there were a record, but we have those two cases. And then we have the Commonwealth case and the McClellan case, and those were generally, they involved generally applicable laws, but laws that also even went to express powers, like the power to engage in real estate transactions. And the question was one of whether, of the degree of interference, and there wasn't enough for the court to be able to make that determination in those cases. And so we've got four cases, only one of them found significant interference, and that was the San Jose case. And as that was later distinguished by the Supreme Court in Anderson, that can be understood as a case involving a particularly unusual and harsh law that had significant deterrent effects. And so I think that's one guidepost for the kind of inquiry that, you know, might. But that seemed like sort of the possibility that it might deter depositors, but there wasn't actual evidence. There wasn't actual evidence, that's right, but I think it was regarded as being a particularly harsh and unusual law. And I think if there's one thing we know about this law, it's not particularly harsh or unusual. In fact, Congress understood when it enacted the provision. So where does the particular harsh and unusual inquiry come in? So I think the word unusual appears in San Jose itself, and then the way that Anderson distinguishes San Jose is by saying that what, it might seem like this is a, you know, on-point case. And, in fact, the court had been asked to overrule San Jose in that case, and they said, well, we don't have to because that can effectively be confined to its facts and involved particularly unusual and harsh law that would deter people from even placing their money in national banks at all. And I think that is some guidepost. Those are conclusions that the court drew using its common sense, not on the basis of a record, and in many ways it seems a very helpful case for your adversary in the sense that the court takes a practical, comparative look and says, well, this is not like the abandonment laws that are as old as the common law. This is 20 years, but it could become five years, it could become seven years, and this could deter people from placing their money in a national bank to begin with, if they thought that California's law could suddenly have the money taken away from them. Your adversary seems to be making in part a similar, you know, to affect the pricing of mortgages by uncertainty about what the interest rates will be. It points to the unusual fact that this interest rate could change every three months and by a single person. Isn't that a similar feature? I mean, maybe ultimately not persuasive, but is that the wrong way to be thinking about this? I don't know that it's entirely the wrong way to be thinking about it, but let me tell you a couple of things I would just add to that as you're thinking about it, and I have some sympathy because this is not the clearest path. I tried to offer up what I thought was the easiest way of resolving the case, but if you want to get into the details, which I understand, then, you know, we're going to have to grapple with these questions. I think that – forgive me, could you just repeat the question one more time? Sorry. I doubt it. I was asking just about whether San Jose has some features, particularly the fact that it addresses the variability, the fact that the laws could change, the fact that different states could have different provisions for when the money would be abandoned. Yeah, I would say a couple of things. The first thing is we have – this is a law that has been on the books for 50 years. State banks have been complying with it. Some national banks have been complying with it. Non-banks have been complying with it. So there's a long history to draw upon. They don't point to a single example of the superintendent exercising authority to go above 2%. In fact, the only time that I'm aware of – they could correct me if I'm wrong on this, but they haven't put anything in their papers – the only time that the superintendent exercised discretion was to actually lower the rate below 2% to match it up with the six-month treasury yield during the past seven years of this litigation. And in fact, as we go down, I don't think we would be asking for a 2% rate during that period because discriminatory laws are separately preempted. And so at most, Bank of America would just have to pay interest that would put it on level with what state banks were paying at the time. So you're saying that that would put it in line with cases like National Bank and Anderson, which just was less concerned with the economic cost on bank operations. I think that's right. And I don't think it's enough just to say this is going to cost some outlay of money or this is going to be more expensive for us or even to our profits because otherwise generally applicable laws that cost money like foreclosure laws or real estate laws or taxation or minimum wage or you name it, those would be preempted. And so I think you need something beyond that. You need to show that there's some significant interference with a particular banking power here. And the particular banking power that's been asserted is the ability to offer these escrow accounts. And I think if that's the power, I do think there is a way in which this 1639 DG3 provision is relevant even though we're not talking about covered accounts because I think it's helpful because if the particular power is the power to offer escrow accounts, then it would be quite odd for Congress as it was mandating the use of those accounts for some mortgages to have left state law intact and indeed made state interest on escrow laws a part of federal law for these purposes if it thought that those laws substantially impaired the ability of lenders to offer such accounts. And I also think this provision of TILA shows that Congress didn't regard the New York law or the California law. These are huge markets that have been around and these laws have been around for decades. It didn't say state laws other than California and New York's which we think are particularly problematic, you know, need to be complied with. It said any applicable law on this topic needs to be complied with. And I think that that provides further support. It's not a complete answer to the question, but further support in trying to look at common sense and the structure of the laws and everything down the line that this is not a particularly unusual or harsh law that would make there be some kind of deterrent effect that could give rise to significant interference, at least on the bare pleadings. And it could be that as the case proceeds, if Bank of America wants to make a record on that, they could do that. We're not saying they can't do that. This is kind of an allowance to the bank to come forward with evidence that they think they have it. But based on what you have before you in common sense, I'm not seeing anything that would allow you to make a determination as a matter of law that the magnitude of these effects are so significant that the law needs to be displaced, even though Bank of America's competitors and indeed national banks have been complying with it without material impairment. Thank you. I think we'll hear rebuttal. Just a few points. This is OCC's problem. It's not. Preemption is a legal question. OCC would only give more deference anyway, so to say the OCC should do something which you're free to ignore is really not that much comfort. Nor does telling the OCC to fix this problem answer how much deterrence, what the rates would happen if the rates changed, or I don't even know how OCC would do this. Can you respond to his argument that we don't actually look at the market effects. The degree of interference has to do with the power that's being exercised. If we were to agree with that, wouldn't that at least obviate some of the concerns that your client might have, that they'll have one preemption decision and then next week it will be more than that. Yeah, that's why you should find this preemption here, because the actual power at issue here is the express mortgage power. The actual express power at issue in Franklin was the savings power. The legal restriction at issue in Franklin was on advertising. Congress said not one word about advertising. So what's wrong with the idea of thinking about National Bank and Anderson as saying we're unconcerned with economic costs, but the ones that are preempted, like first federal savings and Barnett, is when the state law contradicted the express intent of Congress or a federal agency, and then Franklin and San Jose focus on whether or not banking customers were going to be less likely to take advantage of them. Is that an overreaction? No, because of Franklin. Because Franklin and Fidelity are different in complete kind from San Jose. Franklin said, again, nothing about factual. It said banks have to have the right. They're deemed to have the right to advertise, just because. That would prevent the banks from attracting customers to use those accounts, though, right? It said common sense. You would think you should be able to use the word, and common sense tells you when states have never been able to set interest rates. Can you answer the question again, though? I don't mean to interrupt your train of thought. This is actually really important to my evolution in my thinking, is what's wrong with understanding Franklin as saying we are banning the use of the word savings, or the reason it was problematic to ban the use of the word savings was because it prevented banks from attracting customers? Yes, and by telling a bank how it has to price its mortgage, there can be no serious or invasive interference with the bank than how to price its mortgage, just like a savings account. But if the focus is not on the bank but on the ability for deterring customers, what's wrong with that being the phrase? It will never be preempted under that view, because what he just said is that every law is nondiscriminatory. So if any state bank can comply, so too a national bank. And in their view, we just have a very fundamentally different view of preemption, that something that goes to the core of a mortgage, these are all incidental powers in every preemption case except Barnett Bank, and here the incidental power is the interest rate. Again, surely you've been to a bank and had a bank account, and you know that the bank tells you what interest it's going to pay on your loan, not the state. There are no state laws that can tell national banks what they have to pay on their CDs. They could ban checking account fees or tell you anything on savings accounts. That is so unheard of and so incongruous, and it might not deter customers. In fact, it might bring customers. Like, yay. But that's great for customers, terrible for national banks, and there's just no dual banking system. Absolutely no dual banking system if you let 50 states control the pricing on every loan. Can you tell me how that's different from any other state or any other industry that's regulated? I mean, we have a lot of industries that are subject to state law, and I'm sure it's different. Like, I know that the cost of providing utilities in one state is different than the cost of providing utilities in another. Why is this patchwork so problematic? Because of the OCC of the dual banking system. National banks like to be regulated by one regulator, their federal regulators, which are very extensive, and they want to be able to have the same product, certainly on something like a mortgage. So they're not up here saying we want to show you. Again, I don't even know what it would mean to quantify a burden. At least I gave you three types of laws that could be preempted. At least they have zero. There is no law that would be preempted under their test, because a state bank would always be able to comply with it. And Franklin is not about burden. It literally says, which I think is common sense, it says you can't tell banks how to advertise. I think it is even more invasive to tell banks what interest rates they have to pay their customers. The other thing, and I just don't understand how that's any different. And again, on this express power, all the powers in every preemption case has been incidental. It was advertising, San Jose was something about, you know, loaning the money, and in Fidelity it was the due on sale clause. And again, Fidelity kind of dropped out here, but they don't have much of a defense to Fidelity. It's simply intended flexibility that they inferred from a regulator. Congress never has said anything about due on sales. It's not in any statute. You can Google it or you can search it. It doesn't exist. It's simply the OCC said you can have due on sale clauses. Thank you. Thank you both. We will take the matter under advisement. Good to see you both again. Well argued.